THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **AMY GLENN**<br>8487 HALEIGH WOODS DRIVE<br>BLACKLICK, OHIO 43004<br><br>      Plaintiff,<br><br>v.<br><br><br>**ORTHOALLIANCE MSO, LLC**<br>**Dba JIS ORTHOPEDICS**<br>50 E. BUSINESS WAY, SUITE 200<br>CINCINNATI, OH 45241<br><br>c/o Agent, Corporation Service Company<br>50 West Broad Street, Ste. 1330<br>Columbus, OH 43215<br><br>      Defendant. | CASE NO. 2:24-cv-4122<br><br>JUDGE<br><br>MAGISTRATE JUDGE<br><br>**Jury Demand Endorsed Herein** |

## COMPLAINT

NOW COMES Plaintiff Amy Glenn ("Plaintiff" or "Ms. Glenn") and proffers this Complaint for damages against Defendant OrthoAlliance MSO, LLC, doing business as JIS Orthopedics ("Defendant").

## JURISDICTION AND VENUE

1. All counts contained herein are brought pursuant to the laws of the United States, therefore this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

2. This action is brought pursuant to the Americans with Disabilities Act of 1990 as amended, 42 U.S.C. § 12101, *et seq.* ("ADA"), the Ohio Laws of Discrimination, R.C. Chapter 4112

1

("Chapter 4112"), 29 U.S.C. § 2601, *et seq.* (The Family Medical Leave Act "FMLA") and 28 U.S.C. § 1331. This Court's jurisdiction in this matter is also predicated upon 28 U.S.C. § 1367 as this Complaint raises claims pursuant to the laws of Ohio, over which this Court maintains supplemental subject matter jurisdiction.

3. Venue is proper pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in and around Franklin County, Ohio, where the Defendant employed Ms. Glenn at all times relevant to this Complaint and where the events in question took place.

4. Plaintiff has complied with all jurisdictional prerequisites to the filing of this lawsuit and this Complaint is filed within ninety (90) days of Plaintiff's receipt of her Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC"), a copy of which is attached hereto as "Exhibit A".

## THE PARTIES

5. Plaintiff, Ms. Glenn, is a natural person residing in Franklin County, Ohio.

6. Defendant, OrthoAlliance MSO, LLC, is a foreign limited liability company doing business in the Southern District of Ohio.

7. At all relevant times, Ms. Glenn was an employee as that term is defined by the Americans with Disabilities Act of 1990 as amended, 42 U.S.C. § 12101, *et seq.* ("ADA"), by O.R.C. Chapter 4112, and by 29 U.S.C. § 2611(2), the Family and Medical Leave Act ("FMLA").

8. Defendant is an "employer" as defined by the Americans with Disabilities Act of 1990 as amended, 42 U.S.C. § 12101, *et seq.* ("ADA"), by O.R.C. Chapter 4112, and by 29 U.S.C. § 29 U.S.C. § 2611(4)(A).

2

## FACTUAL BACKGROUND

9. JIS Orthopedics was an orthopedic medical practice group specializing in, among other things, joint replacement and rehabilitation.

10. JIS Orthopedics was profitable, enjoyed sufficient business to operate out of two separate treatment facilities in Ohio, one of which was located in the City of New Albany.

11. On or about February 1, 2022, OrthoAlliance MSO, LLC ("OrthoAlliance") took over operations management of the JIS Orthopedics New Albany worksite.

12. OrthoAlliance's acquisition of JIS Orthopedics added the latter's eight physicians, approximately 80 non-physician employees, and two Ohio clinic locations to OrthoAlliance's expanding portfolio of healthcare facilities.

13. OrthoAlliance's JIS Orthopedics clinic was profitable enough to add two new surgery centers to the practice in 2022 and 2023, and the clinic's nursing team was expanded during that time.

14. Defendant's business operations continued expanding into 2024, when Defendant posted several new job openings for their growing Southern Ohio, Central Ohio, and Indiana locations, including the JIS Orthopedics New Albany clinic.

15. In the time since OrthoAlliance acquired management over JIS Orthopedics, the clinic has earned a 1.9 star management rating from current and former employees on Indeed.com.

16. Recent employee reviews on Indeed.com describe the JIS Orthopedics clinic as follows: "Not enough staff for the patient volume," "Busy practice, busy days," and "[JIS Orthopedics] corporate management will lie to your face about almost anything. Be wary of this group."

17. On or about June 7, 2021, Defendant hired Ms. Glenn to work as a Clinic Nurse Practitioner and Clinic Manager in a W-2 capacity at its worksite in New Albany, Ohio.

18. Ms. Glenn's duties included, but were not limited to, managing and diagnosing patients in orthopedics, as well as managing day-to-day clinic operations of clinic staff.

19. During the course of her employment, Ms. Glenn performed her job duties satisfactorily and had no remarkable record of discipline.

20. From approximately 2019 to 2024, Ms. Glenn suffered from a torn labrum in her right hip, a condition related to Femoroacetabular Impingement ("FAI") syndrome.

21. Ms. Glenn's FAI syndrome caused her to suffer substantial levels of groin pain and episodes of joint locking that gradually worsened over time. The condition could not be resolved permanently without surgery.

22. Ms. Glenn treated her disability's symptoms with a combination of injections, medications, and physical therapy, however by March of 2024 Ms. Glenn was unable to remain on her feet for more than two hours before needing to sit down due to the pain.

23. Ms. Glenn's colleagues and supervisors in Defendant's clinic were aware of Ms. Glenn's ongoing and painful hip condition.

24. On or about March 15, 2024, Ms. Glenn met with Dr. William Vasileff, her treating physician, to discuss her torn labrum and worsening FAI syndrome. In response, Dr. Vasileff scheduled Ms. Glenn for hip surgery to occur on July 11, 2024.

25. Ms. Sandy Solomon functioned as Ms. Glenn's direct supervisor at Defendant's clinic and wielded managerial control over Ms. Glenn's work and schedule.

26. On or about March 18, 2024, Ms. Glenn informed Ms. Solomon, as well as the surgeons with whom Ms. Glenn worked, of Ms. Glenn's upcoming surgery.

27. Defendant's response to Ms. Glenn's planned treatment was initially positive.

28. Ms. Solomon, having known about Ms. Glenn's ongoing condition, expressed her support by stating "It's about time you're getting this fixed, Amy."

29. Defendant's orthopedic surgeons were also aware of Ms. Glenn's condition and supported Ms. Glenn's need for surgery.

30. Ms. Glenn contacted Defendant's Human Resources staff via email to secure Family Medical Leave Act ("FMLA") paperwork for the leave she needed after surgery.

31. Defendant's Human Resources ("HR") staff informed Ms. Glenn that everything was in order and provided her with the necessary FMLA and Short-Term Disability ("STD") paperwork.

32. Human Resources also advised Ms. Glenn to file for FMLA starting on April 1, 2024, because the process would be managed by their new third-party provider, New York Life.

33. Ms. Glenn thereafter contacted New York Life, who advised her that approval of her STD paperwork would automatically approve her FMLA paperwork.

34. On or about March 25, 2024, due to changes in Dr. Vasileff's schedule, Ms. Glenn's surgery was rescheduled by one week to July 18, 2024.

35. Ms. Glenn instructed Ms. Solomon and Defendant's scheduler to update the necessary parties about the date change so they could adjust and extend the period during which Ms. Glenn could continue seeing patients leading up to her surgery.

36. Despite her ongoing pain, Ms. Glenn continued to fulfill her normal work duties and comply with OrthoAlliance's medical leave policy for nearly four months as she approached her scheduled FMLA leave date.

37. During these months Defendant did not communicate any concerns or inquiries to Ms. Glenn about her FMLA leave, aside from standard questions regarding her return to work for patient scheduling purposes:

    a. On or about April 1, 2024, Ms. Glenn formally filed for FMLA leave and STD in compliance with Defendant's policies for so doing.

5

b. On or about April 1 and July 3, 2024, New York Life acknowledged Ms. Glenn's claim submission via email.

c. On or about July 5, 2024, Ms. Glenn received an email from Defendant's Benefits Department, stating that Ms. Glenn's FMLA leave had been approved to begin on July 18, 2024, the day of Ms. Glenn's surgery; the email stated that Ms. Glenn would receive formal approval from New York Life once Ms. Glenn's STD was also approved after Ms. Glenn's surgery.

d. New York Life thereafter approved Ms. Glenn for an initial period of FMLA leave from July 18, 2024, through August 7, 2024, to be extended upon submission of reports from her two-week post-operation appointment.

e. On the same day, July 5, 2024, Ms. Glenn confirmed with Ms. Solomon, Benefits Manager Aigner Angel, and HR Lead Kate Haughn via email that her last day of work prior to beginning her FMLA leave would be July 17, 2024.

f. On or about July 6, 2024, Ms. Glenn received a reply from the Benefits Department asking her to email the Benefits Department on July 17, 2024, so that they could update payroll for her absence.

g. On or about July 8, 2024, Ms. Glenn again emailed her supervisor, the Benefits Department, and HR to verify that Ms. Glenn had done everything correctly in preparation for her medical leave; she received confirmation the same day.

h. On or about September 17, 2024, Ms. Glenn sent emails to New York Life to confirm that her departure date was in place and nothing further was needed from her.

i. On or about July 23, 2024, Ms. Glenn received another email confirming that her FMLA and STD had been approved; Ms. Sullivan sent Ms. Glenn an email

6

wishing Ms. Glenn a speedy recovery on the same day.

j. On or about August 5, 2024, Ms. Glenn was approved for an extension of her FMLA and STD to last from August 8 to September 6, 2024.

k. On or about September 4, 2024, Ms. Glenn was approved for an extension of her FMLA and STD to last from September 9 to October 9 and October 6, respectively.

l. On or about September 13, 2024, Ms. Glenn was denied further extension of her FMLA leave.

38. On or about July 1, 2024, Ms. Glenn was informed by her doctor that her colon was not functioning properly and would need to be removed.

39. On or about July 2, 2024, Ms. Glenn informed Ms. Solomon of the colon diagnosis and privately confided in Ms. Solomon that Ms. Glenn planned to have her colon removed during her already-requested FMLA leave period to avoid the need to take additional time off.

40. Unbeknownst to Ms. Glenn, Ms. Solomon communicated news of Ms. Glenn's colon condition and surgery to Defendant's leadership.

41. On or around July 15, 2024, just three days before Ms. Glenn was scheduled to begin her approved, job-protected FMLA leave for hip surgery and subsequent recovery, she received a text from Ms. Solomon and Theresa Sullivan, head of HR for Defendant's Central Ohio network, requesting a meeting.

42. During the meeting, Mmes. Solomon and Sullivan informed Ms. Glenn that her position was being eliminated due to financial reasons, specifically citing low patient volume and the need for the new surgeons to take over her patient load.

43. Previously, in February of 2023, Defendant had allowed Ms. Glenn the ability to

work from home on an as-needed basis so that she could care for her grandmother.

44. At no time did Defendant provide such accommodations to Ms. Glenn so that she could continue working while treating her hip condition.

45. Mmes. Solomon and Sullivan assured Ms. Glenn that her termination had nothing to do with her performance and that there was "nothing [Ms. Glenn] could have done to stop it."

46. However, Ms. Glenn had been assured on multiple occasions that her job position was safe and that OrthoAlliance's finances were healthy.

47. Ms. Glenn's work schedule was often overbooked and/or double-booked with patients.

48. In fact, Ms. Glenn's patient schedule was overbooked during Ms. Glenn's final three days in the clinic.

49. Ms. Solomon had informed Ms. Glenn that any concerns about patient volume were merely a product of either call center mistakes or Defendant's billing department being months behind schedule on submitting charges to patient insurers.

50. In the time between Ms. Glenn's announcement that she would take FMLA leave and the date Defendant terminated her, Defendant hired less experienced Registered Nurse staff and assigned them patients out of Ms. Glenn's workload.

51. Ms. Glenn had been specifically assured that her job position was safe in April of 2024 after Defendant's Dr. Lombardi hired a less experienced and less senior Registered Nurse at a salary of over $99,000 per year and placed her under Ms. Glenn's direct supervision.

52. Defendant failed to terminate any other Clinic Nurse Practitioners or Registered Nurses at the time for workforce reduction purposes.

53. Defendant retained other, less experienced clinic nursing staff at the time of Ms. Glenn's termination.

54. At no time had Defendant ever attempted to engage Ms. Glenn in an interactive dialogue about alternative accommodations to Ms. Glenn's surgery and/or medical leave.

55. Defendant failed to return Ms. Glenn to the same or equivalent job position at the end of her protected FMLA leave period.

56. Defendant flagrantly discriminated and retaliated against Ms. Glenn because of her disability and FMLA usage by terminating her for missing work due to her disability, by terminating her in anticipation of her FMLA usage, and for failing to reasonably accommodate for her disability.

## COUNT I
### Disability Discrimination – R.C. § 4112.02

57. Plaintiff reasserts and reincorporates all allegations in the paragraphs above as if fully rewritten herein.

58. At all times material herein, Plaintiff suffered from an impairment within the meaning of Section 4112.01(A)(16) of the Ohio Revised Code.

59. At all times material herein, Plaintiff was a qualified individual with a disability within the meaning of R.C. § 4112.01(A)(13) of the Ohio Revised Code.

60. Defendant knew Plaintiff was disabled and/or regarded her as disabled.

61. Defendant was aware of the difficulties suffered by Plaintiff as a result of her disability.

62. Plaintiff had to miss work due to her disability and took FMLA leave for that reason; Plaintiff's doctor recommended that Plaintiff take off work for the requested period so that Plaintiff could recover from her medical procedure.

63. Defendant discriminated against Plaintiff because of her disability by terminating her after she was approved for her FMLA leave but before she had the opportunity to take it.

9

64. Defendant discriminated against Plaintiff when it failed to engage in the interactive process by providing insufficient medical leave. Plaintiff requested medical leave as a reasonable accommodation and was terminated because of her accommodation request.

65. Defendant discriminated against Plaintiff because of her disability by taking the following non-exhaustive list of actions: terminating her employment, retaliating against her, delaying her request for reasonable accommodation, and/or by otherwise discriminating against her in the terms, privileges and conditions of employment.

66. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but not limited to serious emotional distress and the loss of salary, benefits and other terms, privileges and conditions of employment for which Defendant is liable.

67. Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for compensatory damages, punitive damages and reasonable attorney's fees and costs.

## COUNT II
**Disability Discrimination – Americans with Disabilities Act**

68. Plaintiff reasserts and reincorporates all allegations in the paragraphs above as if fully rewritten herein.

69. This claim is brought under federal law, pursuant to 42 U.S.C. § 12101, et seq., and as defined in 42 U.S.C. § 12101.

70. Plaintiff is an otherwise qualified individual.

71. Defendant knew or had reason to know Plaintiff suffered from a disability, and/or

regarded her as disabled.

72. Defendant was aware of the difficulties suffered by Plaintiff as a result of her disability.

73. Plaintiff had to miss work due to her disability and took FMLA leave for that reason. Plaintiff's doctor recommended that Plaintiff take off work for the requested period so that Plaintiff could recover from her medical procedure.

74. Defendant discriminated against Plaintiff because of her disability by terminating her after she was approved for her FMLA leave but before she had the opportunity to take it.

75. Defendant discriminated against Plaintiff when it failed to engage in the interactive process by providing insufficient medical leave. Plaintiff requested medical leave as a reasonable accommodation and was terminated because of her accommodation request.

76. Defendant discriminated against Plaintiff because of her disability by taking the following non-exhaustive list of actions: terminating her employment, retaliating against her, delaying her request for reasonable accommodation, and/or by otherwise discriminating against her in the terms, privileges and conditions of employment.

77. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but not limited to serious emotional distress and the loss of salary, benefits and other terms, privileges and conditions of employment for which Defendant is liable.

78. Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for compensatory damages, punitive damages and reasonable attorney's fees

and costs.

## COUNT III
### Retaliation – R.C. § 4112.02

79. Plaintiff reasserts and reincorporates all allegations in the paragraphs above as if fully rewritten herein.

80. Plaintiff engaged in a protected activity by requesting reasonable accommodation for her disability. Specifically, Plaintiff requested time off work for her disability and utilized FMLA leave.

81. Defendant knew Plaintiff engaged in a protected activity, as Plaintiff communicated these requests both verbally and in writing.

82. Once Plaintiff engaged in the aforementioned protected activity, Defendant purposefully retaliated against Plaintiff by taking the following non-exhaustive list of actions: terminating her employment, refusing her reasonable accommodation, and/or by otherwise discriminating against her in the terms, privileges and conditions of employment.

83. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but not limited to pain and suffering, and the loss of salary, benefits and other terms, privileges and conditions of employment for which Defendant is liable.

84. Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for compensatory damages, punitive damages and reasonable attorney's fees and costs.

## COUNT IV
### Retaliation – Americans with Disabilities Act

85. Plaintiff reasserts and reincorporates all allegations in the paragraphs above as if fully rewritten herein.

86. Plaintiff engaged in a protected activity by requesting reasonable accommodation for her disability. Specifically, Plaintiff requested time off work for her disability and utilized FMLA leave.

87. Defendant knew Plaintiff engaged in a protected activity, as Plaintiff communicated these requests in writing.

88. Once Plaintiff engaged in the aforementioned protected activity, Defendant purposefully retaliated against Plaintiff by taking the following non-exhaustive list of actions: terminating her employment, retaliating against her, refusing her reasonable accommodation, and/or by otherwise discriminating against her in the terms, privileges and conditions of employment.

89. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but not limited to pain and suffering, and the loss of salary, benefits and other terms, privileges and conditions of employment for which Defendant is liable.

90. Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for compensatory damages, punitive damages and reasonable attorney's fees and costs.

## COUNT V
### Failure to Accommodate – Americans with Disabilities Act

91. Plaintiff reasserts and reincorporates all allegations in the paragraphs above as if

fully rewritten herein.

92. At all times material herein, Plaintiff was disabled, or regarded as being disabled, as defined in 42 U.S.C. § 12102.

93. Defendant knew or had reason to know that Plaintiff suffered from a disability, and/or regarded her as disabled.

94. Plaintiff was an otherwise qualified individual with a disability. She had no outstanding performance concerns and was specifically informed that her termination was not related to her performance.

95. Plaintiff requested a reasonable accommodation for her disability when she requested no less than twelve weeks of medical leave as recommended by her doctor.

96. A request for time off of work to recover from surgical procedures related to her disability is a request for a reasonable accommodation.

97. The amount of time off that Plaintiff requested was reasonable.

98. Such reasonable accommodations were possible for Defendant to provide.

99. Defendant violated the ADA by failing to reasonably accommodate Plaintiff's disability and by terminating Plaintiff for issues related to her disability.

100. Defendant violated the ADA by failing to engage in a good faith interactive process to determine an objectively reasonable accommodation for Plaintiff's disability.

101. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and

will continue to suffer economic and non-economic damages, including but not limited to pain and suffering, and the loss of salary, benefits and other terms, privileges and conditions of employment for which Defendant is liable.

102. Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for compensatory damages, punitive damages and reasonable attorney's fees and costs.

## COUNT VI
### Failure to Accommodate – R.C. § 4112.02

103. Plaintiff reasserts and reincorporates all allegations in the paragraphs above as if fully rewritten herein.

104. At all times herein, Plaintiff suffered from an impairment within the meaning of R.C. § 4112.01.

105. At all times material herein, Plaintiff was a qualified individual with a disability within the meaning of R.C. § 4112.01. She had no outstanding performance concerns and was promoted.

106. Defendant knew or had reason to know Plaintiff suffered from a disability and/or regarded her as disabled.

107. Plaintiff requested a reasonable accommodation for her disability when she requested no less than twelve weeks of medical leave as recommended by her doctor.

108. A request for time off of work to recover from surgical procedures related to her disability is a request for a reasonable accommodation.

109. The amount of time off that Plaintiff requested was reasonable.

110. Such reasonable accommodations were possible for Defendant to provide.

111. Defendant violated R.C. § 4112.02 by failing to reasonably accommodate Plaintiff's disability and by terminating Plaintiff for issues related to her disability.

112. Defendant violated R.C. § 4112.02 by failing to engage in a good faith interactive process to determine an objectively reasonable accommodation for Plaintiff's disability.

113. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but not limited to pain and suffering, and the loss of salary, benefits and other terms, conditions and privileges of employment for which Defendant is liable.

114. Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages and reasonable attorney's fees and costs.

## COUNT VII
### Interference – Family Medical Leave Act

115. Plaintiff reasserts and reincorporates all allegations in the paragraphs above as if fully rewritten herein.

116. Plaintiff was entitled to FMLA leave, as she suffers from a serious medical condition that entitled her to twelve (12) weeks of FMLA leave.

117. Defendant was aware that Plaintiff suffered from a serious medical condition that qualified her for FMLA leave because she informed Defendant of her condition, scheduled her

FMLA leave for medical treatment, and Defendant approved her medical leave.

118. Defendant interfered with Plaintiff's FMLA rights by failing to provide her with 12 weeks of FMLA leave and terminating her employment three days before her FMLA leave was scheduled to begin, thereby preventing her from taking the full 12 weeks of leave she was entitled to under the FMLA and failing to return her to her position, or an equivalent position, upon her return from leave.

119. Defendant lacked good faith and/or reasonable grounds to believe that it had not violated the FMLA in its discharge of Plaintiff.

120. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but not limited to pain and suffering, and the loss of salary, benefits and other terms, conditions and privileges of employment for which Defendant is liable.

121. Defendant's violations of the Family and Medical Leave Act entitle Plaintiff, pursuant to 29 U.S.C. § 2617(a), to monetary damages which include back pay and benefits, statutory liquidated damages, and attorneys' fees and costs of bringing this litigation, in an amount to be determined at trial.

WHEREFORE, Plaintiff demands:

For all Counts, monetary damages including back pay and benefits, statutory liquidated damages, expert witness fees and attorneys' fees and costs, and front pay, compensatory damages and punitive damages in an amount to be determined at trial, but in any event not less than $300,000.00 in addition to any and all other relief which the Court deems just and appropriate.

Respectfully submitted,

/s/ *Rachel Sabo Friedmann*
Rachel A. Sabo (0089226)
(Rachel@thefriedmannfirm.com)
Peter G. Friedmann (0089293)
(*Pete@thefriedmannfirm.com*)
**The Friedmann Firm LLC**
1457 S. High Street
Columbus, OH 43207
614-610-9756 (Phone)
614-737-9812 (Fax)

*Attorneys for Plaintiff*

## JURY DEMAND

Plaintiff hereby requests a jury of at least eight (8) persons.

/s/ *Rachel Sabo Friedmann*
Rachel Sabo Friedmann (0089226)